# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JULIE DAWN SIPPEL,**

    Plaintiff,

    v.                                                                          **Case No. 22-CV-629-SCD**

**COMMISSIONER OF THE**
**SOCIAL SECURITY ADMINISTRATION,**

    Defendant.

---

## DECISION AND ORDER

---

    Julie Dawn Sippel applied for social security disability benefits based on a combination of conditions. An administrative law judge denied Sippel's claim for benefits in 2019, finding she was still capable of working despite several severe and non-severe impairments. Sippel sought judicial review, and her case was remanded in April 2021 due to the ALJ's failure to fully consider several treating source opinions. The ALJ denied the application again on remand. Sippel now seeks judicial review of that decision, arguing the ALJ once again erred in assessing the weight afforded to the opinions of her treating physicians. I agree that the ALJ committed reversible error in not addressing certain evidence contrary to his conclusion about Sippel's limitations. Therefore, I will reverse the decision denying Sippel disability benefits and remand the matter for further proceedings.

## BACKGROUND

    In 2016, Sippel applied for disability insurance benefits under Title II of the Social Security Act, claiming that she became disabled and unable to work due to a variety of physical impairments, namely: psoriatic arthritis, coronary artery disease, post-status bypass

surgery, obesity, spine disorders, type 1 diabetes mellitus, anemia, hyperlipidemia, hypertension, asthma, irritable bowel syndrome, and strokes.

I.      **Personal and Medical Background**

Prior to applying for disability insurance benefits, Sippel worked for approximately twenty-five years as an administrative clerk at a manufacturing company. R. 41-42. She was laid off in November 2015 along with thirty other employees. R. 42. Sippel testified that she initially looked for other work but was unsuccessful due to her limitations. R. 42. Sippel alleges she was frequently absent from work in the years prior to being laid off due to her psoriatic arthritis. She provided documentation of her work absences during her last two years of employment, which reflects that she was generally able to use vacation and personal days when her arthritis acted up. R. 226-29. Sippel indicated that her job was primarily performed seated and that co-workers helped her with the physical aspects of her job in the last years of her employment. R. 43.

Sippel's work attendance also reflects that she took time off to care for her mother. R. 38, 226-29. She testified that she lived with her mother, who has Alzheimer's, and her twenty-seven-year-old daughter. R. 43, 45. Sippel had been caring for her mother for at least the last ten years and assisted her with self-care, cooking, cleaning, and driving her to appointments. R. 43-45. She testified that her adult daughter performed more strenuous chores because Sippel could remain active for only about 30 minutes before fatiguing and experiencing increased pain levels. R. 45, 382.

At the time of her disability application, Sippel was forty-eight years old. R. 165. She was first diagnosed with psoriatic arthritis more than twenty years ago. R. 45-46. She initially treated the condition with methotrexate, changing to Enbrel in the last five years. R. 45-46. In

2

a function report, Sippel wrote that she had trouble fastening jewelry and doing buttons. R. 206. She was able to do some cleaning and laundry, R. 207, drive a car, and shop in stores, R. 208. She reported that pain and swelling in her joints affected her ability to engage in a variety of physical activities, including lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing. R. 210. Sippel reported that she could continuously sit for one to two hours, stand for one hour, and walk thirty minutes to one hour; in a day, she could sit for two hours, stand one to two hours, and walk one to two hours. R. 213. Her doctor had limited her to lifting ten pounds. R. 213.

On October 5, 2016, Sippel's primary physician, Dr. George Poullette, completed a rheumatoid arthritis medical assessment form in support of Sippel's disability application. R. 222-25, 459-62. Dr. Poullette indicated that Sippel suffered from chronic psoriatic arthritis, with objective signs of joint swelling, tenderness, muscle weakness, reduced grip strength, and chronic fatigue. R. 222-23, 459-60. He indicated that Sippel's side effects from medication severely interfered with attention and concentration on a daily basis. R. 223, 460. Dr. Poullette opined that Sippel could walk one to two blocks, continuously sit for two hours (after which she had to walk or stand), and continuously stand for thirty minutes before she had to walk or lie down. Dr. Poullette further found that: in an eight-hour workday, Sippel could stand less than two hours and sit about two hours; Sippel required eight unscheduled breaks, each lasting ten minutes, during the workday; Sippel could occasionally lift ten pounds and rarely lift twenty pounds, but never more; Sippel could rarely twist or stoop; and Sippel could use her hands for grasping, her fingers for fine manipulation, and her arms for reaching fifty percent of the day. R. 224-25, 461-62. Finally, Dr. Poullette estimated Sippel would be absent

3

from work about four days per month as a result of her impairments or treatment. R. 225, 462.

Dr. Poullette also prepared a letter dated November 17, 2016, in which he indicated Sippel had been under his care for many years and suffered from several medical problems, including psoriatic arthritis, insulin-dependent diabetes, asthma, and irritable bowel syndrome. R. 476-77. He indicated psoriatic arthritis was the primary source of Sippel's disability, which caused chronic inflammation, pain, limited range of motion, and weakness. R. 476. He noted her symptoms progressed despite treatment. R. 476. Dr. Poullette said Sippel was not able to do any physical labor lifting more than ten pounds; chronic repetitive movements aggravated arthropathy in Sippel's arms, hands, and fingers; and Sippel was restricted from bending and lifting due to back pain. R. 476. He indicated that Sippel should avoid standing, sitting, or walking more than two hours consecutively or more than six hours per day total. R. 476. He also noted she had difficulty gripping. R. 476. Dr. Poullette indicated that Sippel used the medication Ultram as needed, which caused some sedation. R. 476. He concluded: "Due to her multiple chronic and progressive medical problems, [Sippel] is not able to work in a competitive environment. She has significant restrictions on her ability to work as outlined above. I support her disability claim." R. 476.

Sippel also provided a rheumatoid arthritis medical assessment form, dated March 15, 2017, from Dr. Manpreet Sethi, her treating rheumatologist. R. 609-12. Dr. Sethi diagnosed psoriatic arthritis, which caused frequent pain in the back, ankles, and right knee. R. 609. Dr. Sethi identified objective signs of joint deformity, impaired sleep, tenderness, weight change, and chronic fatigue. R. 610. Dr. Sethi indicated that Sippel's symptoms would seldom interfere with attention and concentration. R. 610. Dr. Sethi opined that Sippel could walk

4

one to two blocks, sit for about two hours before she had to walk or stand, and stand for thirty minutes before she had to walk or lie down. R. 611. Dr. Sethi found that, in an eight-hour workday, Sippel could stand less than two hours and sit about two hours. R. 611. Dr. Sethi further concluded: Sippel required eight fifteen-minute unscheduled breaks based on chronic fatigue and pain/paresthesia; Sippel could occasionally lift ten pounds, never more, and rarely twist or stoop; Sippel could use her hands for grasping and her fingers for fine manipulation ten percent of the day; and Sippel could use her arms for reaching fifty percent of the day. R. 611–12. Finally, Dr. Sethi concluded that Sippel's impairments would produce good and bad days and more than four work absences per month. R. 612.

## II. Procedural Background

Sippel applied for disability benefits on December 5, 2016. R. 165. She initially alleged an onset date of November 11, 2015, but later amended it to February 8, 2016, to correspond to the expiration of her unemployment insurance. R. 172, 1432, 1872. The state agency charged with reviewing the applications on behalf of the Social Security Administration denied Sippel's application in January 2017. R. 69. State-agency reviewing physician Mina Khorshidi identified four severe, but not disabling, impairments—osteoarthrosis and allied disorders, diabetes mellitus, asthma, and inflammatory bowel disease—and concluded Sippel could perform sedentary work. R. 74. Upon Sippel's request for reconsideration, state-agency reviewing physician Pat Chan identified two severe impairments—osteoarthrosis and allied disorders, as well as vascular insult to the brain—and determined that Sippel could perform light work with occasional stooping. R. 89, 91-92. Based on that assessment, the agency denied Sippel's application again in October 2017. R. 80. Sippel then requested a hearing before an ALJ. R. 109.

5

Prior to the hearing, Sippel provided an update from Dr. Sethi, indicating that since the doctor's previous report, Sippel had suffered a stroke and underwent heart surgery. R. 1388. Dr. Sethi reported these events resulted in "increasing functional limitations, fatigue, weakness, dizziness." R. 1388. Sippel experienced the stroke in May 2017 and underwent coronary artery bypass graft surgery in May 2018. R. 662, 1305. Dr. Sethi noted that, at the time of her update (January 2019), Sippel's "psoriatic arthritis seems to be stable." R. 1388.

On February 13, 2019, Sippel appeared with counsel before the ALJ. R. 31. The ALJ also summoned a vocational expert ("VE") to provide testimony on jobs Sippel might be able to do. R. 49. During the hearing, the VE classified Sippel's past job as an "administrative clerk" under the Dictionary of Occupational Titles ("DOT")—a semi-skilled job, light per the DOT, sedentary as performed. R. 50. The ALJ then asked a hypothetical question, assuming a person of Sippel's age, education, and experience and limited to light work with occasional stooping. R. 51. The VE testified that such a person could do Sippel's past work, generally and as performed, as well as other jobs, including office helper, small products assembler, and electrical assembler. R. 51-52. Adding a limitation of frequent handling and fingering bilaterally did not change the VE's answer. R. 52. If the person were limited to sedentary work with occasional stooping, the person could work as an administrative clerk, as performed, but not generally. R. 52-53. The person could also do other unskilled jobs such as information clerk, addressing clerk, and document preparer. R. 53. Adding a limitation of frequent handling and fingering, the person could still do the administrative clerk job, as performed, R. 54, as well as the other sedentary jobs, R. 54-55.

The ALJ then asked if there were any transferrable skills from Sippel's past work to other sedentary jobs, and the VE identified administrative skills of data entry and use of office

6

equipment. R. 55. The VE testified that these skills would transfer to other jobs including civil service clerk, receptionist, and order clerk. R. 55-56. The VE also testified that employers usually permit one unexcused or unscheduled absence per month and two fifteen-minute breaks per day in addition to a thirty-minute lunch period. R. 57. Exceeding these allowances would preclude competitive work. R. 57.

On June 3, 2019, the ALJ issued a written decision finding that Sippel was not disabled. R. 1537. Due to inadequate analysis regarding Sippel's treating source opinions, this decision was reversed and remanded on April 27, 2021. *See Sippel v. Saul*, No. 20-C-800, 2021 WL 1625657, at *5 (E.D. Wis. Apr. 27, 2021). In September 2019, Sippel suffered a second stroke, which resulted in mild weakness in her right (dominant) arm and difficulties with word finding and short-term memory. R. 2086-87. Thereafter, the ALJ held an additional hearing with Sippel and her counsel on February 8, 2022. R. 1420-45. Sippel testified at the second hearing that she would be about fifty percent slower in terms of work productivity because of her right-sided weakness and would have trouble communicating with co-workers due to the difficulty with word finding. R. 1439, 1441. Ultimately, the ALJ issued another unfavorable decision on March 3, 2022. R. 1396-1412.

In that most recent decision, the ALJ again applied the standard five-step analysis. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ determined that Sippel had not engaged in substantial gainful activity since her alleged onset date. R. 1399. The ALJ determined at step two that Sippel had four severe impairments: psoriatic arthritis, coronary artery disease, status post bypass surgery, and obesity. R. 1399. At step three, the ALJ determined that Sippel did not have an impairment, or a combination of impairments, that meets or medically equals the severity of a presumptively disabling impairment. R. 1402-03.

7

The ALJ next assessed Sippel's residual functional capacity—that is, her maximum capabilities despite her limitations, *see* 20 C.F.R. § 404.1545(a)(1). R. 1403-10. The ALJ found that Sippel had the RFC to perform the full range of sedentary work. R. 1403. In assessing that RFC, the ALJ considered Sippel's subjective allegations, the medical evidence, and the medical opinion evidence and prior administrative findings. *See* R. 1403-10.

When assessing the medical evidence, the ALJ gave "little weight" to the opinions of both treating physicians: Dr. Sethi and Dr. Poullette. R. 1408-09. The ALJ acknowledged that Dr. Sethi was a specialist who treated Sippel for many years but found her opinion presented issues with supportability and consistency. R. 1408. For example, the ALJ observed that Dr. Sethi's treatment notes documented some tenderness, but Sippel retained full range of motion and symmetrical strength, so those findings would not support the need for eight unscheduled breaks per day, as Dr. Sethi had opined. R. 1408. The ALJ highlighted that Sippel was able to "walk and exercise on a daily basis" and that her psoriatic arthritis symptoms were well-controlled. R. 1408. Finally, the ALJ identified a minor inconsistency in that Sippel reported being frequently absent from work, but her absentee record revealed that she simply used her vacation and personal days and was even paid out for unused vacation. R. 1408.

Similarly, the ALJ found Dr. Poullette's opinion lacked consistency. R. 1409. For instance, Dr. Poullette identified significant hand limitations, but Sippel was still able to drive. R. 1409. In addition, the medical records did not reflect that Sippel had ongoing difficulty with medication side effects, and while examinations showed tenderness, Sippel retained normal range of motion and strength. R. 1409. Therefore, despite the persuasiveness of their treating relationships, the ALJ assigned the opinions of Dr. Sethi and Dr. Poullette little weight. R. 1408-09.

On May 27, 2022, Sippel filed this action seeking judicial review of the Commissioner's 2022 decision denying her claim for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 7, 8. Sippel filed a brief in support of her disability claim, ECF No. 18; the Acting Commissioner of the Social Security Administration filed a brief in support of the ALJ's decision, ECF No. 25; and Sippel filed a reply brief, ECF No. 32.

**APPLICABLE LEGAL STANDARDS**

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISCUSSION

Sippel argues that the ALJ failed to provide "good reasons" for rejecting her treating physicians' opinions regarding her difficulty maintaining a normal work posture through a full workday. *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) (observing that an ALJ is required to give "good reasons" for not giving the well-supported opinion of a treating physician "controlling weight") (citing 20 C.F.R. § 416.927(d)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010)). For claims like Sippel's that were filed before 2017, the opinion of a treating physician must be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *See* 20 C.F.R. § 404.1527(c)(2); *Reinaas v. Saul*, 953 F.3d 461, 465 (7th Cir. 2020). "But once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight and becomes just one more piece of evidence for the ALJ to consider." *Bates v. Colvin*, 736 F.3d 1093, 1099-100 (7th Cir. 2013) (internal quotations omitted) (quoting *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008)).

If an ALJ decides not to afford controlling weight to a treating physician's opinion, the ALJ "must offer good reasons" for doing so. *Campbell*, 627 F.3d at 306 (internal quotations omitted) (quoting *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir.2010)). That decision must consider several factors: examining relationship, treatment relationship, length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and any other factors brought to the ALJ's attention. *See* 20 C.F.R. § 404.1527(c). Sippel alleges the ALJ cherry-picked his

11

reasoning, which fails to properly account for her MRI findings, chiropractic treatment, range of motion, exercise, and work history.

### I. MRI Findings

Sippel alleges the ALJ omitted a finding from her MRI and improperly characterized the MRI findings as "very mild" when assessing the consistency of the treating physicians' opinions with the medical record as a whole. The formal impressions from Sippel's MRI indicate: "1. There is very mild degenerative change involving the bilateral sacroiliac joints which are otherwise unremarkable without evidence of active sacroiliitis or ankylosis. 2. There is posterior element hypertrophy in the low lumbar spine, as above. At L4-5, there is moderate left-sided and mild-moderate right-sided neural foraminal stenosis." R. 2260. The ALJ's decision reads: "An MRI of the claimant's spine revealed a 'very mild degenerative change involving the bilateral sacroiliac joints, which are otherwise unremarkable without evidence of active sacroiliitis or ankylosis.' There was also a posterior element hypertrophy in the low lumbar spine. (Ex. 30F, pg. 343-344)." R. 1402. Essentially, the ALJ left out the second half of the second finding, failing to comment on the foraminal stenosis. *See id.* Notably, the MRI report linked hypertrophy and stenosis as part of the same numbered finding. *See* R. 2260.

The Commissioner argues that the ALJ's failure to explicitly reference foraminal stenosis did not affect his RFC assessment. Indeed, Sippel cites to no doctors who interpreted the MRI findings as suggesting additional functional limitations. However, Sippel argues the MRI results support the postural limitations outlined by her treating physicians prior to the MRI being performed. And, while it is true that "ALJs need not comment on every line of

12

every physician's treatment notes," it is still necessary that they "recognize and respond to the physician's principal conclusions." *Kolar v. Berryhill*, 695 F. App'x 161, 161-62 (7th Cir. 2017).

Here, the ALJ drew the "very mild" label directly from one of the MRI's findings, writing: "Given the limited treatment aside from chiropractic care and the very mild findings on the MRI, the undersigned finds that the claimant's back disorder is a non-severe impairment." R. 1402. By doing so, the ALJ generalized the entirety of the MRI findings as "very mild" and failed to address the second principal conclusion involving hypertrophy and foraminal stenosis. Given this misrepresentation, the ALJ should reconsider the MRI findings on remand. Though not an obvious justification for such severe limitations, the MRI findings do tend to support the postural limitations outlined by Sippel's treating physicians and should be examined in this light. *See Wozniak v. Kijakazi*, No. 20-CV-740-SCD, 2021 WL 4146434, at *7 (E.D. Wis. Sept. 13, 2021) ("Although it is unclear how those misrepresentations may have affected the ALJ's decision (if [a]t all), that determination is best left to the Commissioner (possibly after consulting a medical expert).").

## II. Chiropractic Treatment

Sippel argues that the ALJ's superficial mention of her chiropractic treatment constitutes failure to assess evidence consistent with the opinions of her treating physicians. *See* 20 C.F.R. § 404.1527(c)(4) (requiring consideration of a medical opinion's consistency with the record as a whole unless affording it controlling weight). I agree. The ALJ referenced Sippel's chiropractic treatment only in the context of concluding her back disorders are a non-severe impairment, writing:

> The claimant was prescribed tramadol for sleep and received chiropractic care. (Ex. 30F, pg. 24; Ex. 3F; Ex. 10F; Ex. 15F; Ex. 18F; Ex. 19F; Ex. 27F). Given the limited treatment aside from chiropractic care and the very mild findings

13

>on the MRI, the undersigned finds that the claimant's back disorder is a non-
>severe impairment.

R. 1402. The ALJ did not otherwise address Sippel's chiropractic treatment or the findings of her chiropractor, Dr. Knowles. This abstention is significant because Dr. Knowles observed consistent dysfunction—in the form of myospasms and restricted range of motion—in Sippel's lower spine. R. 463-75, 638-43, 793-800, 828-37, 838-59, and 2121-32. Such findings contradict the ALJ's conclusion that Sippel "retained full range of motion." R. 1407.

Moreover, the ALJ rejected the treating physicians' opinions in part based on inconsistency. R. 1408. The consistency factor refers to how consistent a medical opinion is "with the record as a whole," which means that it is irrelevant that neither of Sippel's treating physicians relied on the chiropractic records in forming their opinions. *See* 20 C.F.R. § 404.1527(c)(4). Ultimately, because the findings of Sippel's chiropractor contradict the ALJ's conclusion about her condition and are consistent with the findings of Sippel's treating physicians, the ALJ was not free to ignore them. *See Arnett v. Astrue*, 676 F.3d 586 (7th Cir. 2012) ("Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence."). After all, a claimant may advance her case by "identifying any objective evidence in the record corroborating [her treating physician's] statement." *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021).

The Commissioner appears to argue harmless error by contending that, despite Sippel's favorable findings in the chiropractic records—dysfunction and restricted range of motion—these records actually "revealed that Plaintiff was responding 'favorably' to treatment and conveyed Dr. Knowles's belief that Plaintiff would 'experience additional functional improvement.'" *See* ECF No. 25 at 14 (citing R. 463-75, 638-43, 793-800, 828-37,

14

838-59, 2121-32). In a similar vein, the Commissioner contends that Sippel "failed to show that functional limitations revealed by these chiropractic records were not already reflected in the ALJ's RFC assessment." *See* ECF No. 25 at 14. However, I cannot insert my own assessment of these records given that the ALJ did not mention any of Dr. Knowles' findings. *See Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) ("One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant."). As Sippel points out, such an attempt to "bolster the ruling with evidence the ALJ did not rely on" could violate the *Chenery* doctrine. *See Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *Chenery*, 318 U.S. at 95). *But see Senn v. Astrue,* No. 12-C-326, 2013 WL 639257, at *7 (E.D. Wis. Feb. 21, 2013) (noting that "The actual holding of *Chenery* does not support such a broad rule.") Moreover, the benchmark for harmless error is whether it is "obvious" that no reasonable factfinder would conclude the chiropractic records provide material support to the opinions of Sippel's treating physicians. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (declining to remand despite ALJ's failure to articulate her reasons for rejecting a portion of a medical opinion because it would produce only "a statement of the obvious"). Because I find that result is not obvious, the ALJ's omission of Sippel's objective evidence was not harmless error.

### III. Range of Motion

Sippel asserts the ALJ's conclusion that she "retained full range of motion" is improper because the ALJ conflated evidence regarding her hands and lower spine. *See* R. 1407. Essentially, Sippel contends the ALJ overlooked evidence that her range of motion was restricted in her lower spine. This argument is intertwined with the preceding one regarding Sippel's chiropractic treatment because her chiropractic records are the primary

15

evidence of her restricted range of motion in the lumbar spine. *See* R. 463-75, 638-43, 793-800, 828-37, 838-59, and 2121-32.

Sippel insists that the ALJ's conclusion about her range of motion relies on records regarding range of motion in other areas of her body, and to the extent those records concern her lower back, they note only findings of pain and tenderness. *See* R. 1408 (citing R. 538, 548, 559, 575, 818, 1192-97, 1172, 1921.) Sippel is correct that most of the records cited by the ALJ indicate a normal range of motion specifically regarding Sippel's hips, knees, ankles, and feet—not her whole body. R. 559, 570. However, the record does include notes indicating range of motion was normal without specification to a body part. *See* R. 538, 548. Notably, even these records indicate tenderness of the bilateral sacroiliac joints consistent with Sippel's claim. *See id.* In addition, Dr. Poullette's medical opinion from 2016 indicates that "exams have shown complete full ROM." R. 76. Given these generalized conclusions, the integrity of the range of motion finding is called into question by the chiropractic records concerning only Sippel's lower back. Therefore, Sippel's chiropractic records support remanding her case for reconsideration of the range of motion finding.

## IV. Exercise

Sippel argues the ALJ improperly cited her exercise as a basis for rejecting her treating physicians' opinions. I agree. "When an ALJ discounts a treating [physician's] opinion, he must explain how it was 'necessarily inconsistent' with other medical evidence." *Stocks v. Saul*, 844 F. App'x 888, 893 (7th Cir. 2021) (citing *Gudgel v. Barnhard*, 345 F.3d 467, 470 (7th Cir. 2003)). Sippel's admitted exercise is not an appropriate example of "necessarily inconsistent"

16

evidence. Sippel told providers that she walked twenty to thirty minutes on most days, weather permitting. R. 2015, 2069.

In November 2016, Dr. Poullette opined that Sippel could stand and/or walk with normal breaks for a total of two hours per day. R. 76. In 2017, Dr. Sethi found that Sippel could walk one to two blocks without rest or severe pain and that she could stand less than two hours total in an eight-hour workday. R. 611. Sippel's statement that she walks twenty to thirty minutes does not reveal how many blocks she covers or whether she takes breaks. And a mere twenty minutes of walking is fairly modest activity to begin with. Therefore, her exercise is not *necessarily* inconsistent with the opinions of her treating physicians.

Moreover, the ALJ's statement that Sippel maintains the ability to "walk and exercise on a regular basis" is misleading given that Sippel acknowledged only walking and no other exercise. R. 1408. Because Sippel's exercise does not undermine the consistency of her treating physicians' opinions, the ALJ's reliance on this factor further supports remanding the matter to reconsider the weight afforded to the treating physicians' opinions.

V.     Work Records

Finally, Sippel challenges the ALJ's discussion of the vacation time she used in her most recent job. In this regard, the ALJ wrote:

> Finally, the undersigned reviewed the claimant's absentee record from when she worked. Although the claimant contends that she was frequently absent, it appears that she simply used her vacation and personal days. She was even paid out for unused vacation. (Ex. 3E, pg. 25). This is only a minor inconsistency as the claimant does not allege disability until after she stopped working, but it is relevant because the claimant worked with the same impairments for years, stopping only because of a layoff having nothing to do with her ability to perform the work successfully on a full-time basis.

R. 1408. Sippel maintains that the ALJ erred by claiming that her ability to work prior to applying for disability benefits demonstrates an ability to work afterwards. This contention

17

appears to stretch the ALJ's finding. The ALJ simply acknowledged that Sippel was able to balance the time off she needed for her condition with that afforded by her employer and found a minor inconsistency in light of Sippel's contention that her condition would require too much time off for an employer to accommodate. These circumstances were appropriate for the ALJ to consider. In fact, Social Security Ruling 16-3p directs that an ALJ should consider a claimant's "prior work record" and "efforts to work." Social Security Ruling 16-3p; Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1020935, at *14169 (Mar. 16, 2016).

At the same time, "employment is not proof positive of ability to work, since disabled people, if desperate (or employed by an altruist), can often hold a job." *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998). In balancing these competing concerns, the ALJ deemed Sippel's absentee record only a minor inconsistency. R. 1408. The vocational expert testified about the number of unexcused or unscheduled absences and the number of routine rest or break periods that employers customarily tolerate. R. 1893. The ALJ merely acknowledged that Sippel did not encounter this issue during her most recent period of employment despite battling her allegedly disabling health conditions. Therefore, I find substantial evidence supports the ALJ's conclusion.

* * *

In sum, Sippel's overarching claim stands: the ALJ failed to provide "good reasons" for rejecting her treating physicians' opinions regarding her difficulty maintaining a normal work posture through a full workday. The ALJ erred in assessing Sippel's MRI findings, chiropractic treatment, and exercise. This shortcoming does not necessarily entitle Sippel to

18

Case 2:22-cv-00629-SCD    Filed 09/18/23    Page 18 of 19    Document 33

disability benefits; that determination must be made by the ALJ upon appropriate consideration of the foregoing factors.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ committed reversible error in evaluating Sippel's MRI findings, chiropractic treatment, and exercise. Accordingly, I **REVERSE** the Commissioner's decision and **REMAND** this action pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 18th day of September, 2023.

_____
STEPHEN C. DRIES
United States Magistrate Judge